## GERMAN-AMERICAN FINANCE CORPORATION v. MERCHANTS & MANUFACTURERS STATE BANK OF MINNEAPOLIS AND ANOTHER.[1]

June 7, 1929.

No. 27,260.

[1]Reported in 225 N. W. 891.

*Joss & Parker,* for appellant.
*D. F. Nordstrom,* for respondents.

HILTON, J.

Plaintiff, a Minnesota corporation, appeals from an adverse judgment.

Action to compel A. J. Veigel, commissioner of banks and liquidating agent of the defendant bank (hereinafter referred to as the bank), to carry out certain agreements theretofore made by officers of the bank with plaintiff's predecessor and for the transfer and delivery to plaintiff of certain collateral held by Veigel.

Prior to April 1, 1918, plaintiff's corporate name was German-American Mortgage Corporation. On that date its name became Traub & Mantz Mortgage Corporation, and on January 1, 1926, the present name was adopted. The corporation will hereinafter be called plaintiff, irrespective of what its name was at the specific times mentioned. On February 15, 1926, the bank was closed and is now in process of liquidation by the commissioner of banks.

During the year 1922 and until February, 1923, one Hoveland was president of the bank; he was succeeded in that capacity by J. H. Meier until February, 1924, when M. D. Smiley was appointed president and thus remained until the bank was closed. All transactions here involved were carried on by Hoveland and Smiley for the bank during the respective periods when each was the bank's president and managing officer and by C. A. Mantz for the plaintiff. Each had full authority to act within the scope and power of his office and had power to bind his principal, limited only by restrictions imposed by law and custom and usage.

Prior to the closing of the bank plaintiff was a borrower of the bank and kept its commercial accounts with it. On April 7, 1922, the bank owned certain bonds, known as Holmes Securities Company bonds, in an aggregate sum of $30,000. On that date these bonds were traded to plaintiff at a discount of 10 per cent, $20,000

in first farm mortgages and $7,000 in second farm mortgages (the latter bearing no interest) being received therefor and becoming the assets of the bank. Collections were made on the second mortgages, reducing the amount to $6,648.61. The second mortgages were criticized by the banking department and ordered to be removed from its assets. Plaintiff was requested by Hoveland to repurchase the second mortgages and to give the bank a note (exhibit C) dated September 8, 1922, due December 8, 1922, secured by the second mortgages as collateral, for the balance unpaid thereon in the sum of $6,648.61. This was done. At the time of the giving of said note an arrangement was made in writing by means of letters between Hoveland, in the name of the bank, and Mantz, representing plaintiff, to the effect that the note was given simply as an accommodation to the bank and that plaintiff was at no time to pay the same and that said note was given without consideration and no liability assumed.

This note was in all things regular upon its face, bearing interest at six per cent. At that time Mantz and another officer of the plaintiff were liable upon a note dated October 17, 1919, for $14,000, which note was for a loan obtained for the benefit of plaintiff.

On September 8, 1922, plaintiff's indebtedness at the bank on three other notes was $11,200, all well collaterally secured, exclusive of exhibit C. This main indebtedness was materially reduced as will hereinafter appear. The bank records disclose that on December 30, 1922, interest upon exhibit C in the sum of $106.99 was paid and $398.50 was paid upon the principal, reducing the amount of the same to $6,250.11; that a renewal note dated December 8, 1922, due June 8, 1923, for $6,250.11 was then delivered by plaintiff; that on maturity of the last mentioned note, another note for like amount, due in six months, was given to the bank by plaintiff. An indorsement upon the principal of this note of $36 was made October 4, 1924, reducing the principal to $6,214.11. Renewal of this note was made January 2, 1925, when $14.11 upon the principal was paid and also the accrued interest, reducing the amount to $6,200, and a new note executed therefor due July 2, 1925. All of the notes

herein referred to bore interest at the rate of six per cent per annum, and each had upon its face the statement:

"Having deposited with said bank as the owner, and as agent for the owner, of this note, and pledged as collateral security for the payment hereof and of all other debts and liabilities to said bank due, or to become due, or that may be contracted hereafter, the following, viz: sundry mortgages now on file."

Then followed a lengthy recital relative to the securities such as is usually found on such collateral notes.

The second mortgages hereinbefore referred to were held by the bank until January 2, 1925, at which time they were delivered to plaintiff and were never returned to the bank. Although said last described note was dated January 2, 1925, it was not delivered until January 16, 1925, at which time Smiley wrote a letter, signed in the name of the bank, to the Traub & Mantz Mortgage Corporation, in which it was stated:

"In consideration of your waiving all claims to any defense to a certain note dated June 8, 1923, and maturing December 8, 1923, for the sum of $6,250.11, we agree to accept a renewal of this said note in the sum of $6,200.00 upon payment by you of $14.11, the balance on the above described note being at this time the sum of $6,214.11 together with accrued interest from June 8, 1923, at the rate of 6%.

"In consideration of our accepting this renewal you are to return a certain letter written to the Traub-Mantz Mortgage Corporation and signed by one A. M. Hoveland as president of this bank, which is now in your possession. As a consideration on our part for your waiving all of your rights to any defense and your voluntary admission of liability on this note, we agree that this note shall be carried by this bank for a period of five years without interest. The note may be renewed from time to time for a period of six months. It is further agreed that $15,000 collateral, now in possession of bank, shall remain as security back of this note and other notes aggregating $8,658.00, until said notes amounting to $8,658.00

have been paid, at which time all collateral is to be turned over to Traub & Mantz Mortgage Corporation and the above described $6,200.00 note is to be carried the balance of the five years without collateral.

"It is further agreed that collateral can be exchanged at any time, providing collateral of equal value is furnished.

"As a further consideration of our accepting a renewal of your obligation, you are to write a letter to this institution stating that you admit liability on the note of $6,200.00 and waive all rights to any defense other than set forth in the above agreement."

In reply to this letter, the Traub & Mantz Mortgage Corporation accepted the terms of the foregoing letter and returned the Hoveland letter. None of the papers evidencing the secret arrangements made by plaintiff with Hoveland and Smiley were kept with the bills receivable and collateral securities of the bank, nor were they intended to be; nor were they ever discovered in the numerous examinations made by the state bank examiners. The note of January 2, 1925, was renewed for six months on July 2, 1925, and it in turn was renewed for a like term on January 2, 1926, and is the note (exhibit N) involved in this suit.

The dispute arises regarding the collateral to this note and the maturity of the same. Defendants have on hand collateral aggregating $13,682.50, being the specific items listed in plaintiff's complaint, except a proper deduction of $500. Plaintiff's contention is that defendants have no right to hold the collateral as security for the $6,200 note but only for the $3,210.13 remaining unpaid on plaintiff's other indebtedness to the bank. Plaintiff offered to pay the latter amount and demanded return of the collateral.

The defendants contend, and the lower court so found, that the right existed to enforce payment of both amounts and that the collateral secured the same, notwithstanding the provisions in the letters hereinbefore referred to, and that plaintiff was estopped from denying such right. By a proper counterclaim defendants asked for appropriate relief to enforce that right. The court also found that the plaintiff's exhibit N, the $6,200 note, became a part of the

bank's assets and was represented as part of its assets in the reports called for by the state banking department, a copy of each of which was published according to law, and that plaintiff had knowledge thereof. As conclusions of law the court held that defendants were entitled to the relief asked for as above indicated, and judgment was entered accordingly.

Three propositions are urged by the defendants in support of the judgment here appealed from: (1) That the actions of Hoveland and Smiley, while they occupied the position of president of the bank, were ultra vires; (2) that plaintiff is estopped from claiming any rights under the agreement made with Smiley as president of the bank; (3) that the parol evidence rule estops plaintiff from asserting conversations and written agreements made contemporaneously with or prior to the note and that all such negotiations are presumably embodied in the terms of the note.

It is not necessary for us to consider the first and third. We base our conclusions upon the second—estoppel. A full statement of the facts has been necessary in order that there may be a clear understanding of the situation. The record does not disclose anything improper in the transfer of the building bonds from the bank to plaintiff in exchange for the $27,000 worth of mortgages of which $7,000 were second mortgages, not bearing interest. The state banking department criticized these second mortgages and refused to permit them to be considered as assets. The Hoveland agreement was manifestly entered into for the sole purpose of deceiving the state banking department as well as the stockholders and creditors of the bank. It was a fraudulent purpose, participated in by both parties thereto. It accomplished the end in view. The transaction with Smiley was of the same nature. It too must have been for, and accomplished, a like fraudulent purpose. If a note, not due for five years and bearing no interest and unsecured, would have been satisfactory to the banking department as an asset, why was such a note not given? Instead, a note, valid on its face, bearing interest and amply secured, was given with an undisclosed agreement that attempted to rob it of all elements of

acceptability as an asset. It was suggested that the arrangement made by Smiley was more advantageous to the bank than was the Hoveland agreement. Perhaps it was; nevertheless it was tainted with fraud. The matter cannot be considered on a percentage basis. In the Smiley transaction there was a consideration emanating from the bank to plaintiff for it appears that at the time of the delivery of that note the second mortgages were returned to plaintiff and have ever since been held by it.

Reference is made to decisions and textbooks in which it is stated that a receiver of a bank occupies no better position than the bank and takes the property of the bank subject to all equities which existed at the time of his appointment. This general proposition is not at all controlling here.

"While the general rule undoubtedly is that the receiver of an insolvent corporation has no greater rights than those possessed by the corporation itself and a defendant in a suit brought by him may take advantage of any defense that might have been made if the suit had been brought by the corporation before its insolvency, it is equally true that when an act has been done in fraud of the rights of the creditors of the insolvent corporation the receiver may sue for their benefit, even though the defense set up might be valid as against the corporation itself." Lyons v. Benney, 230 Pa. 117, 79 A. 250, 34 L.R.A.(N.S.) 105, and cases cited; Farmers & M. State Bank v. Cons. School Dist. No. 3, 174 Minn. 286, 219 N. W. 163, citing Divide County v. Baird, 55 N. D. 45, 212 N. W. 236, 51 A. L. R. 296; 23 R. C. L. 116, et seq.

The business of banking is affected with a public interest. The law requires frequent examinations to be made by state officials, and other regulatory methods are adopted to insure proper banking conduct. One of the primary objects is to determine the condition of the bank as to solvency. The notes held by it as assets must be genuine and enforceable obligations of the makers thereof and not subject to hidden and secret agreements that relieve from the contract terms of written instruments. Otherwise the state examinations and published reports, sworn to by the bank officials, will be

valueless; the confiding public, lulled into a feeling of security, may be deceived and grossly wronged. Plaintiff, after entering into such a fraudulent scheme for the purpose of circumventing the law, cannot be permitted to escape liability. A bare statement of the proposition should be sufficient. However the courts have frequently spoken with no uncertain sound.

In Golden v. Cervenka, 278 Ill. 409, 427, 116 N. E. 273, 281, we find:

"Where notes or other securities have been executed to a bank for the purpose of making an appearance of assets, so as to deceive the examiner and enable the bank to continue business, although the circumstances may have been such that the bank itself could not have collected the securities, it has been held that the receiver, representing the creditors, could maintain the action, and the makers were estopped, upon the insolvency of the bank, to allege want of consideration. Hurd v. Kelly, 78 N. Y. 588, 34 Am. Rep. 567; Best v. Thiel, 79 N. Y. 15; Sickles v. Herold, 149 N. Y. 332, 43 N. E. 852, affirming 15 Misc. Rep. 116, 36 N. Y. Supp. 488; State Bank of Pittsburg v. Kirk, 216 Pa. 452, 65 Atl. 932; People's Bank v. Stroud, 223 Pa. 33, 72 Atl. 341; Dominion Trust Co. v. Ridall, 249 Pa. 122, 94 Atl. 464; Lyons v. Benney, 230 Pa. 117, 79 Atl. 250, 34 L.R.A.(N.S.) 105."

"So this appellant was a party to a scheme of the officers of the bank to enable them to make a deceptive and fraudulent showing of assets, and as the fraud was perpetrated upon the creditors, now represented by the bank's receiver, he can maintain an action on the note for their benefit. * * * Neither the law nor good conscience can sanction the contention of the defendant that he ought to be permitted to take advantage of the fraudulent agreement between him and the bank to which its creditors were not parties and for whom the receiver sues." Lyons v. Benney, 230 Pa. 117, 120, 79 A. 250.

"It will never do for the courts to hold that the officers of a bank, by the connivance of a third party, can give to it the semblance of solidity and security, and, when its insolvency is disclosed,

that the third party can escape the consequences of his fraudulent act." Pauly v. O'Brien (C. C.) 69 F. 460, 461.

See also Brannan, Neg. Inst. Law, p. 282; Ryan v. Security S. & C. Bank, 50 App. D. C. 292, 271 F. 366; Murphy v. Gumaer, 18 Colo. App. 183, 70 P. 800; Vallely v. Devaney, 49 N. D. 1107, 194 N. W. 903; Allen v. Hay, 64 Can. S. C. 76; 34 L.R.A.(N.S.) 105, note; L. R. A. 1916A, note, p. 1218.

The conclusions reached by the trial court are correct, and the judgment is affirmed.

WILSON, C. J. (dissenting).

A controversy existed between the parties, involving the question of plaintiff's liability on the $6,250.11 note which plaintiff claimed was an accommodation note. Its claim was in good faith and with some color of right. In such situation the bank made a proposition of settlement or compromise as evidenced by the letter of January 16, 1925, set forth in the opinion. It is plaintiff's exhibit K. Plaintiff's exhibit L is an unqualified acceptance of the proposition; and a contract was thereby made. By this contract plaintiff waived its alleged defense and has not since denied liability. It merely asserts its contractual rights evidenced by these two exhibits to the effect that certain collateral is to be released and surrendered and the indebtedness carried for five years without interest. Granting that the authorities cited sustain the doctrine of estoppel as to an accommodation note as against the receiver of the bank, I do not understand how this doctrine can be invoked here after the settlement. I speak only of the conditions and circumstances subsequent to January 16, 1925.

The opinion apparently rests upon the proposition that the $6,200 note and its renewals remained in the assets of the bank containing a recital that it was secured by "sundry collateral now on file," and that the note was to draw interest. The provision for interest was inconsistent with the new agreement but it could not be construed as a modification or repudiation thereof. Such was not the intention of the parties. If the banking department was deceived thereby it was wholly because of the bank, since plaintiff did not know

that the letters were not kept with the note. The deception, if any, related only to the interest. That was too trivial to be important. The contract required the collateral to secure this note until the other indebtedness was paid. The notation that the note was secured by collateral was true. The contract alone disclosed the fact that at a certain time in the future the collateral was to be surrendered. The trial court found that the note was included as an asset of the bank "in the called reports of the state bank examiner." Of course it was. It was an asset. The inclusion was the truth. Plaintiff does not deny liability on the note. There was here no secret or hidden agreement. These letters constituting the contract were presumably in the bank's correspondence which the examiner never examined. The mere fact, if it be a fact, that the bank examiner did not see the letters cannot deprive the plaintiff of the benefit of its contract. It did not by its conduct mislead the examiner. If the bank officials did not see fit to attach the contract to the note so that the examiner could find it the fault is not plaintiff's.

In this case the examiner testified that he did not go through the bank's correspondence, that he did not see these two letters, and that they were not in the note pouch or collateral file.

Plaintiff carried out its agreement evidenced by the letters. The bank did also, until it passed into the hands of the commissioner. No interest was demanded or paid on this note. Plaintiff paid its interest on other indebtedness. There was not a single thing done by the bank or plaintiff inconsistent with plaintiff's contentions. I do not see how the doctrine of estoppel is now applicable.